Please the court. My name is Lawrence Mann. This is a case, your honors, interpretation of a section of the Hours of Service Act, and it relates to sleeping quarters for railroad employees. And in order to give you a perspective of where we are today, I think I need to walk you through briefly a chronology of what Congress did with respect to the sleeping quarters provisions under that Act. In 1976, Congress adopted a provision that said it shall be unlawful for common carrier or agents to provide sleeping quarters for employees which do not afford an opportunity for rest, free from interruptions caused by noise under the control of the railroad, in clean, safe and sanitary quarters. A penalty provision was added that stated that any common carrier subject to this chapter or any officer or agent shall be liable for a penalty. In 1988, Congress changed the penalty provision only. It said a penalty was changed from common carrier to person, including railroad or an agent. So all they changed there was the words common carrier to person. The problem I think you have, Mr. Mann, is to balance that against the consistent interpretation of the FRA that these provisions did not extend to private hotels. That's correct, Your Honor. In 1978, there was a decision by FRA that it did not apply. That's why we have the 1992 statute. Congress in 1992 amended the statute, and what it said was, again, it amended the penalty provisions. And it said that a person, and we're talking about the penalty provision only, who violates it, including but not limited to a railroad or agent. Now, keep in mind that the FRA interpreted railroad or agent up until this time. And then it added lessor of railroad facilities, which we are talking about here, and including any independent... Lessor of railroad facilities? Yes. The sleeping quarter. The sleeping quarters. The motel is... The motel is a facility. Okay. The railroad has to provide sleeping quarters for the railroad employee. A railroad facility is not owned nor operated by the railroad, is it? They lease out a section of the motel for, say, a year or two years. They set aside a complete section. When some of our distinguished visiting judges stay at the Fairmont, does it become a court facility? No, absolutely not. We're not talking about the Fairmont Hotel or Hyatt Regency. What we're talking about is a railroad subleased facility where they set aside X number of rooms for the railroad crews that come in after 12 hours of work. They are required to go to this location unless they want to pay for it out of their own pocket. Is this an annual lease? What are the arrangements? Well, they do it for long periods of time, the railroad, so they'll have a permanent space for the railroad employees. It's not a day-by-day type lease. They say, all right, Motel X, set aside 20 rooms for us until our lease runs out, whatever that period is. And it's usually for a year or longer even. So in 1992, Congress added that provision and any independent contractor providing services to a railroad. Certainly this motel is providing the service to the railroad for providing sleeping quarters. And what Congress said is important, and I should have quoted it in my brief, but it is in the amicus brief in this case, in House Report 102-219 at page 8, where Congress is discussing the intent of this provision. And it says, the purpose is to clarify that FRA has enforcement authority over any entity that may violate rail safety orders or rules. So if this entity, this sleeping quarters, violates the provisions of providing a safe, clean, and sanitary quarters or a noise, undue noise, then it violates the 1992 statute. That's our position. And it seems very clear in the Senate report what Congress intended to do. If that's not the case, there would have been no reason for Congress to amend that section. What had happened between 19- I thought these were changes made not just in this statute, but seven or eight other statutes. Oh, all the rail safety statutes, all of them. What was happening, and the reason for that is this, Your Honor, well, two things were happening. One is the railroads were contracting out a significant amount of their work between 1976, when the original act was amended, and 1992. So they needed to make sure that independent contractors, those working for railroads, less sores of any facilities, would be included in the statute. Well, I'm having trouble with your argument because you're relying on legislative history, and the House report specifically says this section simply makes the Secretary's current, in other words, existing authority explicit. Well, up until that time, you had a whole series of interpretations by the FRA that excluded these outside hotels. Well, they're making explicit that the authority is over any entity, any entity. And if I could just dovetail into what Judge O'Scallion said, don't we owe deference to the FRA and their interpretation of regulations over which they are required to administer a law? Yes, that's correct, to a certain extent. And haven't they said that facilities not owned by the railroad are not encompassed within this? They said that. Their policy statement was prior to the adoption in 1992. If the FRA's position is accurate, there would have been no need to make the amendment to the Hours of Service Act provision. Why would you include lessor of railroad facilities or any independent contractor providing service? There would be no need to do that if they were correct. But Congress was making clear that if the railroads are going to contract out their work, see, in 1976, most of the sleeping quarters facilities were owned by the railroads and operated by the railroads. And when you read the AAR's amicus brief, they admit that. Things changed between 1976 and 1992. And that's what Congress did here. And keep in mind, Your Honors, all the interested parties were involved with this legislation in 92. The rail industry, the rail workers were very concerned because fatigue was a major issue, a very major issue, and it was highlighted in the hearings by the National Transportation Safety Board chairman in 1991, which led to these changes. The FRA wasn't the only party here dealing with these issues. Many, many interested parties had an input into this legislation. Are you seeking penalties against the Portola Motel? Well, what we're doing- Because that's one way of reading this 1992. No, what we're doing is we're saying that the FRA should investigate this and make a determination whether there's a violation. They're saying there's no jurisdiction. That's the issue here. As against the Portola Motel, not against the Union Pacific. That's correct. That's correct. And the federal government is saying, well, we can't do that because we don't think there's jurisdiction. But again, and I don't want to keep beating a dead horse, Congress had no reason to change the provisions in 1992 if what I am saying is not accurate. That cuts two ways. They could have made the legislation even more certain to reverse the administrative determinations that had been up to that time. That's what we're saying they did. That's exactly what we're saying they did. Because why put in this language otherwise? Leave it the way it was. And that's how FRA is interpreting this, in my judgment. Thank you, and I'd like to reserve back the balance. You may certainly do so. We'll hear from the government, please. Good morning, and may it please the Court. My name is Peter Klocki. I'm with the U.S. Department of Transportation Office of the General Counsel. This petition for a review of agency action presents a straightforward issue of statutory construction, namely, is the Federal Railroad Administration's 25-year-old interpretation of the sleeping quarter provisions of the hours of service laws as not applying to commercial motels and hotels the reasonable construction of that provision? The application of that construction in this case concerns a complaint that was raised to FRA by the United Transportation Union regarding sleeping quarters at a motel in Portola, California. UTU alleged that there were problems with the electrical wiring and with excessive noise. FRA's decision that it could not assert jurisdiction over this property is plainly supported by the structure of the Act, by the legislative history of the Act, and by accepted laws of statutory construction. The specific statutory language at issue here is found in Clause 1 of 49 U.S.C. 21106 and states that a railroad, its officers, and agents may provide sleeping quarters, including crew quarters, camper bunk cars, and trailers for their employees, and it requires that those types of accommodations be clean, safe, and sanitary and be free of noise under the control of the railroad that would prevent employees from getting their needed rests. Now, the term providing sleeping quarters is a term that is capable of more than one construction. As FRA has recognized, it could refer to all types of accommodations, but it also could refer to specific types of accommodations, that is the types that are typically owned or operated by railroads and have railroad employees as their exclusive customers, as it were. And the decision at issue here construed the term in that way, as the FRA has been doing since 1978. That is a reasonable construction. It is consistent with the holdings of this Court, as this Court has observed, that words in a statute should be understood by the company that they keep, and in construing that provision, FRA has done exactly that by relying on the parenthetical examples that follow the words providing sleeping quarters, specifically types of quarters that have one thing or a couple of things in common, namely the fact that they are typically owned and operated by railroads and are usually for the exclusive use of railroad employees. But that's not exclusive language, it's inclusive language. That's right, it's inclusive language. That does not mean that the notion that those describe a general type of accommodation and that FRA properly relied on that notion of statutory construction, that that is not correct. And basically what FRA did is look at these accommodations and said, well, what do they have in common? And those are the types of things that they have in common. If you add commercially run motels or hotels to that list, then those sorts of facilities stand out. They are not typical. And that analysis is supported by other parts of the Act, by its legislative history. For example, in Section 2 of the Act, the Act speaks of sleeping quarters referred to in Clause 1 of this section, the clause at issue here, in an area or in the immediate vicinity of an area in which railroad switching or humping operations are performed. In other words, in a rail yard. In effect, that defines sleeping quarters as used in the entire provision as the kind that a railroad would normally construct or reconstruct. And the legislative history of that provision confirms this because in referring to Clause 2, it talks about construction by railroads of, quote, lodgings in the railroad yards. And that legislative history is reproduced in the appendix to the government's brief at Appendix Page 3. Counsel, Mr. Mann makes a very strong argument that this all got changed in 1992 when significant language referring to any entity and by implication facilities not owned by the government or by the railroad or not present in a rail yard. What's your response? Well, Your Honor, as we stated in our brief, there's really no authority to take what is a penalty provision, and one, as the panel has pointed out, that applied to not only all of the hours of service laws, but in other sections of the penalty revisions, all the other railroad laws, to take that and make that into essentially a substantive provision of the law. What the penalty provision does, as penalty provisions often do, is tell you who might be liable for a violation, but it does not tell you what a violation is. For that question, which is really the threshold question, you have to look at the provisions of the statute that define what the substantive violations are. And in this case, in the context of the sleeping quarter provisions of the hours of service laws, you specifically ask, well, what facilities are covered by the substantive provisions? And FRA's construction of that provision is that public lodgings, hotels or motels, a facility like the Sierra Motel at issue here, were simply not covered by that provision, both in terms of the wording of the statute, it's the interplay of that section with other sections of the Act, and its legislative history. For example, if you take a look at the noise provision of Subsection 1, it specifically, and this is very clear, talks about the agency's authority to ensure that sleeping quarters are free of interruptions caused by noise under the control of the railroad. Well, facilities such as the Sierra Motel are often miles and miles away from the nearest railroad tracks or railroad yards. The type of noise that would be expected at such facilities has nothing to do with the type of noise that is, quote, under the control of the railroad. The location of the hotel picked is under the control of the carrier. Yes, it is, Your Honor, but if that were how one should read that provision, then that would essentially read out that provision, because in that case, one could imagine that any type of noise would be, quote, under the control of the railroad. And if there were any doubt about that, the legislative history specifically said, and again, this is on page Appendix 3 of the government's brief, that the phrase under the control of the railroad is to hold a railroad responsible only for the noise its operations are creating. So the type of noise that has been alleged in this case, road noise, from logging trucks and the like, clearly is not noise that its operations are creating. Now, if Congress had intended to regulate hotels and motels that aren't anywhere near railroad facilities, it's awfully odd that they would not have given FRA the authority to regulate noise, the type of noise that would be typical of those types of loggings. And I've addressed your question about the argument that UTU makes with respect to the 1992 amendments, and one other thing I would want to add to that is that in the legislative history that counsel for UTU referred to, if you read on, and this legislative history is set forth in the amicus brief in the appendix, appendix pages 16 through 17, counsel for UTU pointed to a passage, I believe that said the revised penalty provisions, well, the passage that I'm referring to is that the revised penalty provisions, which were proposed by FRA to clarify the secretary's existing power over entities, and again, later on, the committee notes that FRA, in submitting the proposed revisions, did not identify any existing problems relating to safety and rail supply. It is highly unlikely that FRA would have, and I can tell you it did not, submit proposed language, which was then adopted as this penalty law revision that would repudiate, which by then was a longstanding interpretation of the sleeping corridor provisions of the hours of service law. So this language comes directly from our FRA, and it was not intended to repudiate the agency's own position. The interpretation of these provisions that is urged by UTU also would produce some odd results. I think that if Congress had intended hotels and motels to be covered by these provisions, clearly they would have said so, expressed at least somewhere in the legislative history, but we see absolutely nothing in the legislative history or the debates over this provision back in the 70s, or for that matter with respect to the later amendments that UTU places so much weight on about that. And you would have seen this, I think, because, for one, it would have meant Congress was commanding an agency to regulate an industry that it had never regulated before, subjecting that industry that had been never regulated by this railroad safety organization to be subject to inspections and civil penalties. Surely Congress would have... You say industry, you mean the private hotel industry? Correct, yes, yes. Subjecting them to this sort of regulation is surely something that would have appeared somewhere in the congressional debates on this provision either in the 70s or later on when the penalty provisions were revised. It would also likely to some extent intrude on what is a traditional area of state and local regulation. The matters such as these that UTU raises with respect to the Sierra Motel are typically the subject of local codes and ordinances, and while it certainly is not unheard of for Congress to give agencies the power to preempt or to share regulation in these areas when they do so is usually debated, and they usually say so, and there is none of that with any of the pieces of legislation we're talking about here. It would also have placed new responsibilities and new burdens on the FRA inspection force. In addition to inspecting railroad properties, track, hazardous materials, transportation and security and the like, railroad inspectors would now also be inspecting perhaps hundreds, perhaps thousands of hotels and motels around the country. Give me an example of a lessor or an independent contractor who is subject to penalties under your interpretation of the Act but excludes the Portola Motel. That's a very good question, Your Honor, and I think And I think that the example would be, for example, in a case where a railroad has its own crew quarters in a rail yard but decides it wants to contract out the actual operation of those crew quarters to a company that is experienced in providing accommodations or food service, which is usually also provided in these sorts of facilities, that contractor would be subject to the provision. Because the crew quarters were owned and operated originally by the railroad, and they made the discretionary decision to have Hilton Hotels operate. That's right, or even if it was never actually operated by the railroad, even if it was owned by the railroad, correct, and if they hire a company to operate it, then that would be an independent contractor that would be subject to liability under the Act. Now, counsel for UTU has talked about the details of the lease at issue in this case. There's nothing in the record about that. I don't think that in any way changes FRA's position here. The main point is that this was not a facility that was owned or operated by the railroad. And in sort of further answer to your question, Judge Bea, if the railroad owned the property in my example and leased it out, then you would have a situation where the Act would apply. That is simply not the case here. The question arose regarding penalties against the Portola Motel. I think UTU's brief does say that they would want to hold the motel or have FRA hold the motel liable for civil penalties, but also I think the railroad as well under UTU's construction, either one could be held liable. That, I think, really sums up the government's case, Your Honor. I think that the interpretation here of what is plainly an ambiguous provision of the statute is a longstanding one. It is entitled to deference. In fact, this case is very similar to a case involving this Hours of Service Act that this Court heard just a year and a half ago. In that case, we also had a longstanding interpretation of the Act that was challenged. This Court cited the longstanding interpretation and the fact that the interpretation was contemporaneous with the enactment of the statute as a basis for affording the agency deference. Which case was that? That was also UTU v. Mineta, Your Honor. It was the same petitioner and the same respondent. And the case is cited in both the government's brief and the petitioner's brief. 2003 case. Yes. And we think in this case, as in that case, the FRA's decision was a reasonable one, a reasonable construction of the Act, and we respectfully request that the Court deny the petition for review. Thank you, counsel. Mr. Mann, you have some reserved time. Thank you. First, I'd like to address the drafting of the language. The attorney for the government would have you believe that this was done only by the FRA. That's not what happened. I happened to be involved in that legislation, and the FRA consulted with the industry, consulted with the National Transportation Safety Board, all the interested parties in putting this together. There were many, many amendments to the 1992 safety statute, not just the Hours of Service Act provision. And everyone, all the interested parties were involved in this. So it wasn't just FRA. They did technically put the language together, but they weren't the only parties involved in the policy of this decision making. The other, with respect to the noise under the control of the carrier, the carrier chooses the facility, the sleeping quarter, and if that sleeping quarter is defective, deficient, unsafe, whatever the case may be, the carrier is responsible also. I want to make that clear, because they are required to provide the sleeping quarters, which are safe and free from noise under their control. We're not talking about being next to the airport in a Hyatt being covered. That's not what we're talking about. We're talking about all over this country, all the small communities everywhere else, where the railroad carves out a certain number of rooms for the employees for definite periods of time. That's what we're talking about. But you've got to say that the noise is really not under their control. The only control they have is to select a different facility, but they can't control the noise. That's correct. I agree. We are saying that if they choose X facility, at least make sure it has some minimum requirements so that people can get sleep. We're talking about safety here, and every day you read fatigue causing accidents, and if we can't get sleep, that is the employees can't get rest, this is what Congress was trying to correct. And with the FRA's interpretation, that's just not happening. Counsel, there was a reference toward the end of Mr. Plocky's presentation to the 2003 case. Yes. I was on that panel, as you know, and I'd be curious in terms of how you would distinguish that case from this. Primarily, the statute in the 2003 case, the section that you interpreted, was not changed by Congress. That was why the court concluded that the 25-year interpretation by the FRA had great significance, and the court relied on that deference. But here, Congress changed it in 1992. That's the distinction, and I think it's a significant distinction. The other point I want to make, and it's just one point, regarding the word provide, Mr. Plocky is saying that it is ambiguous. It's strange that it's ambiguous in that they never, ever, in any public proceeding, have ever said that provide was not what is commonly understood to be. And moreover, they allege to have drafted these provisions. So if it's ambiguous, then they are at fault. But I think you give it the common language that all of us understand. What does provide mean? And it's simply that you make available, supply or furnish. Thank you very much. Thank you, counsel. The case just argued will be submitted for decision. And we will now. The panel will take a recess before hearing the final two cases, which I must say raise some very, very interesting issues. It occurred to me in reading the Sanchez and the Clayworth cases that we have two very interesting opinions from highly respected and distinguished district judges who have reached absolutely opposite conclusions with respect to whether Subsection 30A provides a private right of action. So I think the panel will be quite interested in hearing the development and the contrast between the two opinions. And I would counsel those of you who are going to be arguing those two cases to help us sift out the distinctions between the two. We will take a recess. All rise. This order of the court stands to recess to five minutes. Do I get a hug? Oh, okay, I'll get a hug right now. I'll get a hug. Please be seated.
judges: O'scannlain, Cowen, Bea